## CADO et al. v. MANY. *
### No. 16904.

Court of Appeal of Louisiana. Orleans.
April 4, 1938.

E. Howard M'Caleb and Robert Guerard Hughes, both of New Orleans, for appellant.

Jos. F. Monie, of New Orleans, for appellees.

JANVIER, Judge.

On April 26, 1932, between 12 o'clock noon and 1 p. m., Nicholas Cado, Jr., aged eight, while on the sidewalk in front of his home on Henry Clay avenue in this city, was struck and injured by a bicycle which was being operated by Lawrence Waguespack

*Rehearing denied May 2, 1938.

(sometimes called Lawrence Junker), an employee of defendant, George J. Many, owner of the bicycle and operator of a nearby drug store known as the Laurel Pharmacy. Alleging that, at the time, Waguespack was acting within the scope of his employment by Many and that his negligence was the sole cause of the accident, Mr. and Mrs. Cado, father and mother of the injured boy, seek judgment against Many in their own behalf for medical and other expenses in the sum of $500, and, for the use and benefit of young Cado, for his sufferings and injuries, they pray for judgment in the sum of $4,000.

They charge that the operation of the bicycle on the sidewalk, in violation of ordinance No. 1750 C.S., was negligence and was the cause of the accident, for the reason that their young son, not required to anticipate the approach of the bicycle, was struck by it just as he emerged from his yard and stepped upon the sidewalk.

Many, while denying the charges of negligence, placed his main reliance upon the contention that Waguespack, though in his employ, was, at the time of the accident, not acting within the scope of his employment, for the reason that he had been fully and completely relieved of duty at 12 o'clock in order that he might go to his home for lunch, not being required to return and resume his duties until 1 p. m.

Since it is obvious, from the statements of counsel made in this court, that no great reliance is placed by defendant upon the contention that Waguespack, in riding upon the sidewalk, was not negligent, and since the record contains little evidence indicating that there was a substantial reliance in the court below upon that defense, it is obvious that the matter went to trial below principally on the issue of whether or not Waguespack was acting within the scope of his employment.

Judgment was rendered in favor of plaintiffs for $153.60 for medical expenses and, on behalf of their minor son, for $750. Defendant has appealed, and plaintiffs have answered the appeal, praying that the judgment be increased to the amount originally sought.

Plaintiffs, though not conceding that in general there is no liability in a master for injuries caused by a servant while going to and returning from meals, although using a conveyance furnished by the master, contend that, even in the absence of special circumstances, the general rule, if there is one, does not apply here, and that there is liability here because of the asserted fact that Waguespack, though at the time on the way to his home to get his lunch, was incidentally burdened with packages, the delivery of which was among his principal duties as an employee of defendant.

If that be a fact—that he was accomplishing two objects—the one having to do with the serving of his own interests and the other with the accomplishment of one of the purposes of his employment—then there can be no doubt as to the liability of the master, and we deem it expedient to first investigate that issue of fact, because, if that issue be decided favorably to plaintiff, we need give no consideration to the question of law, whether a master is liable for injury caused by a servant while on his way to or from a meal in a conveyance furnished by the master.

Plaintiffs rely upon what their counsel is pleased to term "affirmative evidence" and confidently assert that we must accept that evidence as against what they call "negative testimony" tendered by defendant.

That such a rule for the weighing of evidence exists is conceded even by Mr. Wigmore, one of the outstanding authorities on the rules of evidence, who, however, criticizes it as unsound.

"Nevertheless, from some source not traceable, there lingers in the judicial mind, in many quarters, an antiquated notion that negative impressions are not so probative as affirmative impressions; and a charge to the jury often embodies that notion where the witnesses differ. The truth is that the conditions affecting correctness and fullness of observation are so numerous and varied that the one under consideration has a negligible or minor status. Modern psychology sneers (or smiles) at the law's crude assumption that the complexities of human perception can be handled by some rules of thumb about negative testimony or the like." Wigmore on Evidence, 2d Ed., § 664, pp. 1070, 1071.

But we do not view the testimony tendered by defendant as negative. The witness relied upon states: "I did not have any packages at all." It is this testimony which counsel for plaintiffs characterizes as negative because it contains the word "not." That is not our understanding of negative testimony. If "A" says that he saw something and "B" says that he did not see it, then obviously, "B's" statement is negative because the positive view by one person is

clearly entitled to more weight than the statement by the other merely that he did not see the thing which the first positively saw. But, if "A" says that "B" had a package in his hand and "B" says he did not have a package, then we do not see that "B's" statement is negative in the sense contemplated by the rule of evidence referred to.

■ But, whatever may be the rule as to the comparative effect of negative as against positive evidence, it seems to us that the evidence tendered by defendant on this point plainly preponderates. Many denies that Wauespack was burdened with packages and, while he did not have recollection as to that particular day, he states that he had a rule which prevented a delivery boy from delivering packages during the lunch hour, and his testimony on this point is fully corroborated by Waguespack, who, in addition to testifying concerning the rules and instructions of the master, states that, as a matter of fact, he most positively had no packages on that day.

Plaintiffs rely on the statement of Stephen Cado, an uncle of the injured boy, who claims to have seen the accident from across the street and who says that "Waguespack did have packages." His recollection as to the nature of the packages was not clear and there is no doubt that, in several instances, his testimony contained contradictions and inaccuracies. In the first place, he testified that when the collision occurred he saw the packages as they flew through the air and he later indicated plainly that he did not know that there were any packages until he saw the boy, Waguespack, "as he picked them up." Stephen Cado's description of the packages is most uncertain and, while the point is not conclusive, we note that, when he was required to state the color of them, he selected blue, although it is positively shown that Many used only green paper in wrapping his packages. A reading of all the evidence on this point convinces us that Waguespack did not have packages with him at the time and, therefore was not directly acting, to that extent, within the scope of his employment.

But plaintiffs' counsel relies upon his statement of the legal proposition that there was liability merely by reason of the fact that Waguespack, while on his way to lunch, was operating a vehicle furnished by the master. This legal proposition is stated by plaintiffs' counsel as follows:

"Even if this Honorable Court should find that Lawrence Waguespack did not have packages and was not actually making deliveries for the defendant at the time of the accident, the defendant is nevertheless liable."

In other words, he declares that, as a matter of law, the master is liable for injuries caused by a servant while the servant, on his way to a meal, negligently operates a vehicle owned by the master and furnished to the servant for the purpose of making the said trip. Counsel declares that the above set forth proposition is established by jurisprudence and recognized by the text-writers.

■ But we find the contrary to be true, and that it is only where there is some distinguishing fact—such as the performance at the same time of service for the master, or when the master furnishes the vehicle in order that the servant may more quickly return to work—that there is liability in the master.

In Berry's Law of Automobiles, 7th Ed., vol. 4, p. 649, the general rule is stated as follows:

"Even if the employer gives his permission to the use of his automobile by an employee to go to lunch, such use being in no way connected with the business of the employer, he is not liable for the acts of the employee at such time."

In Corpus Juris, vol. 42, § 868, p. 1108, the rule is set forth in the following language:

"The use by the chauffeur of the owner's vehicle for the purpose of going to and from his place of employment is a use for the purposes of the chauffeur, and the owner is not liable for an injury occasioned while it is being so used, either without his knowledge or consent or with his permission, as, for example, where he is going to or returning from a meal. The owner may, however, be liable where under the circumstances the chauffeur's use of the vehicle may be regarded as also for the owner's purposes, as where it enables the chauffeur to arrive earlier at his work, or shortens the time which he is required to have to procure his meals."

In 5 Blashfield's Cyclopedia of Automobile Law & Practice, Permanent Edition, § 3042, we find the rule stated as follows:

" * * * the relation of master and servant must ordinarily be deemed suspended while he is going to and from his meals, particularly where the servant is to board himself, and, the master is not liable for the

servant's negligence while so traveling to and from meals, although the servant is driving the master's machine."

And Huddy's Cyclopedia of Automobile Law uses similar language in vol. 7–8, § 100, p. 265:

"Ordinarily when the chauffeur is using his employer's automobile for the purpose of procuring his meals, he is not engaged in his master's business, and the master is not liable for his negligent acts on such a trip."

■ In each case the particular facts must be investigated in an effort to determine whether there was anything which might justify a belief that the master's interests were, at the time, being served. It is settled, for instance, that, if the master furnishes the vehicle so that the servant, by using it, may return to work sooner than would otherwise be possible, the master is responsible because the use of the vehicle is in the furtherance of his business. It is also well settled that, though the servant may be on his way to a meal, if the master makes use of him to deliver packages incidentally, or to perform some other duty in connection with the trip, there may be liability in the master. But, as we have said, where there is no object other than the servant's personal interests there is, generally speaking, no liability in the master.

Plaintiffs point to the case of Duffy et ux. v. Hickey, 151 La. 274, 91 So. 733, 735, as authority for the proposition that the general rule holds the master liable. But there, though the master was held liable, there were peculiar facts which clearly justified the conclusion reached and which distinguish it from the cases which have established the general rule that, without distinguishing facts, there is no liability. For instance, in that case the employee, Flemming, was the driver of a taxicab. He had been instructed by the master, when on his way home for meals, not to use the taxicab —in other words, "to leave the car on the stand and not take it to go to supper." On the occasion in question Flemming, after delivering a fare, found himself at suppertime very near to his home and very far from the taxicab stand. He therefore concluded that it would be in the interest of the master for him to use his cab to go to his nearby home rather than to return it to the stand and then go home in a street car. The Supreme Court held that he was justified, under the circumstances, in using his discretion, and that, under those circumstances,

the master was liable for the accident, which happened on the way to his home. But the court further clearly indicated that, had those peculiar facts not existed, there would have been no liability—in other words, if he had been merely going to supper the legal situation would have been entirely different. Note the following:

"To say that Flemming was merely going to supper, and therefore was on a mission of his own, is to lose sight of the main purpose he had in view."

Counsel says that there should be recovery because the bicycle was furnished so that the boy might the more quickly return to work, but the record does not bear out this statement. It was shown that the boy was allowed one full hour for lunch and that the master had no concern at all with his actions during that hour. There is nothing to contradict the statements of both Many and the boy on this point. Many says:

"Q. Was he allowed the use of your bicycle to go home for lunch each day? A. He was.

"Q. You permitted him to use your bicycle to go home for dinner in order that he could save time and be back to your store in less time than if he walked, did you not? A. He was given an hour.

"The Court: Q. He was given an hour for lunch? A. From 12:00 to 1:00.

"Q. To utilize as he pleased, is that correct? A. That is correct.

"Q. If he wanted to use the bicycle, he could use it? A. That is right."

And the boy, in this respect, testifies as follows:

"A. I was allowed an hour for lunch between 12:00 and 1:00.

"Q. 12:00 to 1:00 was for your lunch? A. Yes.

"Q. Was that your own time? Could you do anything you wanted to between 12:00 and 1:00? A. Between 12:00 and 1:00 was my time; I could do anything I wanted."

■ We are convinced that the boy, Waguespack, was not carrying packages for the master, and, therefore, was not directly engaged in the furtherance of the master's business, and we are also convinced that he was not required to hurry in going to and returning from work and, therefore, the furnishing of the bicycle by the master is of no significance.

There are various contentions presented by plaintiff which we have not found it necessary to discuss. We do refer, however, to the argument that the boy must have been wrong in his statement as to the time at which the accident happened because the injured boy was on his way back to school after having had his lunch, and that, therefore, the accident must have occurred later than Waguespack says it did occur. It may be that Waguespack was a little late in leaving his place of employment and that the accident did not occur until a few minutes later than the time which he fixes.

But we do not think this is of great importance, and certainly it is not sufficient to convince us of the untruthfulness of the positive statements of Many and Waguespack that the latter was not required to hurry and that he had ample time within which to eat his lunch before resuming his duties. Under all the circumstances we think the facts here bring the case within the general rule that the master is not liable for injuries caused by the servant while on his way to a meal and while operating a vehicle furnished by the master, since there are no facts which show that the interests of the master were at the time being served.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is annulled, avoided, and reversed, and that there now be judgment in favor of defendant and against plaintiffs dismissing their suit at their cost.

Reversed.

McCALEB, J., absent.